## HUMPHREY v. THORP.

### (Circuit Court, D. Oregon.   July 15, 1898.)

### No. 2,404.

1. COMPRMOISE BY ATTORNEY—EVIDENCE OF AUTHORITY.

On an issue as to whether plaintiff had authorized his attorney to make a certain compromise of notes which he held for collection, the attorney testified that in June plaintiff had authorized him to make the compromise. Plaintiff denied this, and introduced letters written by the attorney after the alleged grant of authority, asking for instructions as to such compromise. In other letters written after the compromise the attorney justified the compromise on the ground that he had written to plaintiff beforehand, telling him that he would make it unless instructed to the contrary. Plaintiff denied receiving such letter, and letters in evidence, written just before the compromise, contained no such statements.   An attorney for the maker of the note, who left the town more than a month after the alleged authority, testified that just before leaving he had refused to make the compromise because plaintiff's attorney did not have the originals of the notes, and produced no authority for making such a compromise. *Held,* that there was sufficient evidence to sustain a finding that there was no authority for the compromise.

2. PROMISSORY NOTE—COMPROMISE—CONSIDERATION.

The maker of a note, who was foreclosing a mortgage on property on which there was another prior lien, deposited in court the amount of such lien, to be used in satisfaction thereof.   The attorney for the payee of the note, who was also attorney for the holder of the first lien, made an agreement with the maker of the note that the amount applied in satisfaction of the lien should be credited on the note. *Held,* that such agreement was without consideration, and not binding on the payee of the note.

3. COMPROMISE—RATIFICATION.

And the fact that the payee wrote to the attorney asking him why, if he had made a collection on the note, he did not pay it over, did not amount to a ratification of the agreement. ·

4. PAYMENT—SUFFICIENCY OF EVIDENCE.

On an issue as to whether a balance on a note had been paid, an attorney who claimed to represent the payee testified that at the time of the first payment an agreement was made whereby a certificate of deposit for considerably more than the balance was turned over to him by the maker's attorneys, to be used in payment of the note as soon as the original should be forwarded to him, and that he put the certificate in his safe, where it has been ever since.   The certificate, however, was of a date more than a month later than the alleged agreement.   The firm of attorneys for the maker afterwards dissolved, and payee's attorney formed a partnership with one of them.   The certificate of deposit was afterwards sent to the other one, who still represented the maker, and by him cashed.   The maker's testimony did not show that he had not received the proceeds of the certificate. *Held,* that the evidence failed to establish the issue.

5. COURTS—CONFLICTING JURISDICTION.

An action in personam in the courts of a state cannot be pleaded in abatement in another action in a federal court in another state, although there is an identity of parties, subject-matter, and relief sought.

O. F. Paxton and J. V. Beach, for plaintiff.
J. T. Ronald and R. A. Ballinger, for defendant.

BELLINGER, District Judge.   This is an action upon two promissory notes, in which the jury found a verdict in favor of the plaintiff in the amount claimed.   The defendant relied upon the defense of payment, concerning which the facts are as hereinafter stated.

The defendant moves for a new trial upon the following grounds: First, insufficiency of the evidence to justify the verdict; second, that the verdict is against law; and, third, errors of law occurring at the trial. The particulars relied upon in support of the first ground are: (1) That the testimony shows, without conflict, that the notes were paid in full; (2) that there was uncontradicted testimony to the effect that a compromise of the debt had been effected by plaintiff's attorney, and that plaintiff understood the terms and conditions upon which his said attorney claimed to have received and to hold money paid on account of said notes or compromise, and that the plaintiff did not repudiate such compromise, but ratified it; (3) that the testimony shows, without contradiction, that the plaintiff's attorney was authorized to collect said notes, and that he received on their account at least the sum of $1,500, which fact was known to the plaintiff, and that plaintiff had demanded the same of his attorney, and that there was, therefore, no greater sum due upon the notes than the balance after deducting the amount so received. The point relied upon in support of the second ground of the motion is that the jury disregarded the instructions of the court as to the ratification by the plaintiff of the alleged agreement of compromise. Various particulars are assigned in support of the third ground of the motion, but the point mainly relied upon as to this is that the court erred in not sustaining defendant's defense of another suit pending for the same cause of action in the district of Washington. The notes sued on consist of two promissory notes for the aggregate sum of about $2,700.

The plaintiff had authorized C. S. Hannum, an attorney of Juneau, to collect the notes sued on. Thorp, the maker of the notes, was absent in the Yukon country. He was represented in what was done by Bostwick & Crews, a firm of lawyers at Juneau. A suit was pending at Juneau by Thorp to foreclose a mortgage held by him upon certain mining property. One Arvey had a judgment for some $1,500 against the defendants in the Thorp foreclosure, which appears to have constituted a lien upon the mortgaged property prior to Thorp's mortgage lien. Arvey had intervened for his lien in Thorp's suit. Hannum was authorized, according to Bostwick's testimony, to represent the Arvey claim. Thorp deposited $1,500 with the clerk of the court to secure or discharge the lien of Arvey, the intervener. Under these circumstances, Hannum, claiming to act for the plaintiff, entered into an arrangement with Crews, who was acting for Thorp, by which it was agreed that Arvey's lien should be satisfied and discharged, and the $1,500 on deposit with the clerk of the court, on account of which the Arvey lien was to be satisfied, should be credited as a payment upon plaintiff's notes. This was upon the assumption that Thorp had no property liable to execution, and that by getting rid of the Arvey intervention Thorp's mortgage would become an available resource, from which the balance due on the notes, after crediting the $1,500 as provided for, could be paid. The date of this alleged agreement was August 4, 1896. In pursuance of this agreement, Hannum gave a receipt as follows:

"Juneau, Alaska, August 4th, 1896.

"Received from Willis Thorp the sum of fifteen hundred dollars ($1.500.00), to be applied in payment on those two certain promissory notes dated at Portland, Oregon, January 20th, 1894, in favor of Samuel Coulter, signed by Willis Thorp, which said notes are held by James Humphrey. Copies of said notes are hereto annexed.

"C. S. Hannum, Attorney for James Humphrey."

To pay the balance, amounting to about $1,500, due on the notes, there was delivered to Hannum by Crews, as defendant claims, a certificate of deposit on a Seattle bank for something above $3,100. It is contended for defendant (1) that plaintiff expressly authorized Hannum to make the agreement referred to; (2) that plaintiff has ratified what was done; (3) that the general authority to collect the notes is sufficient, without any special authority, to authorize the so-called compromise that was made.

The question as to whether plaintiff authorized Hannum to enter into this agreement, or ratified Hannum's acts, was submitted to the jury, and their verdict is conclusive against the defendant as to these matters, unless the evidence is insufficient to sustain the verdict; and such a contention the defendant makes as one of the grounds of his motion. There is no testimony tending to prove that the plaintiff authorized Hannum to enter into the agreement relied upon, except that of Hannum himself, who testifies that in June, 1896, on his return from the East, he discussed the proposition made by Thorp with plaintiff and Mr. Beach, one of plaintiff's attorneys; that the latter declined the offer made; that two or three days thereafter, and just as the witness was leaving Burkhard's building, on the East side, to take the train for Tacoma on his return to Juneau, plaintiff drove up with his horse and buggy in "considerable haste," and told the witness that he had concluded to let him (the witness) have those notes upon the conditions they had talked about. The witness, further testifying as to what then took place, says:

"When he drove up to the curb on that day (the day that I left), I then asked Mr. Humphrey,—I says, 'There is no use of my going over [to Beach's office], Mr. Humphrey, because I would not have anything to do with those notes in the way of collection unless they could be fixed up and settled according to the terms I suggested to you and Mr. Beach; and unless I can take the notes and settle with them on that basis, I do not care to take them.' 'Well,' he says, 'if there is nothing that can be attached up there, why I have got some collateral security from Coulter, and I could get the balance out of him, and you take the notes.' "

The notes were then in Juneau, in the hands of a Mr. Maloney, and Hannum testifies that he was instructed to take the notes if Maloney had not begun an action upon them. Humphrey, the plaintiff, denies that any such conversation ever took place between him and Hannum. He states that he did have a meeting with Hannum on the occasion mentioned by the latter; that he asked Hannum to call at Beach's office on his way over; that Hannum did so, the witness being there when Hannum arrived; and it was then agreed to let Hannum have copies of the notes, with authority to collect them if Maloney had not begun an action upon Hannum's return to Juneau, and that there were no other conditions made or dis-

cussed. After Hannum's return to Juneau, and on July 8, 1896, he wrote a letter to Beach, which is in evidence. In that letter he acknowledges receipt of copies of the notes forwarded by Beach, and says that he requested Bostwick & Crews to allow him to renew the proposition made by the witness while in Portland, and that they consented to do so provided he (Hannum) would give them a definite answer by the return boat. The writer goes on to say: "If accepted, kindly send me the original notes, with written instructions to settle in accordance with the propositions herein contained." These propositions are the same as those that plaintiff had already authorized Hannum to accept, according to the latter's testimony. On July 25th following, Hannum wrote to the plaintiff, referring to his letter to Beach, and requesting an answer to his question, "Shall I take $1,500 on the notes?" etc. Why these requests for authority to make the so-called compromise should have been made if Hannum was already authorized to do so, is not explained; nor is it explained why, if, for any reason, he wanted this further or formal authority, he finally did make the compromise without receiving the authority requested. Beach testifies that he wrote to Hannum, inclosing copies of the notes as promised, and giving specific instructions to proceed by action against Thorp on the notes, if Maloney had not already done so. This testimony contradicts Hannum's, which is to the effect that the letter of Beach containing the copies of notes contained no instructions; that it contained "just two or three lines, that was all; just called my attention to the copy of the notes, that was all; no instructions about that one way or the other." Hannum is also contradicted by a letter written by him to Humphrey on November 3, 1896. This letter refers to Beach's letter inclosing copies of the notes, as follows: "Which letter instructed me to proceed to make collection of these notes in the event Mr. Maloney, of Juneau, had commenced no action in the matter." In this letter of November 3d Hannum refers to a statement contained in a letter received by him from plaintiff, as follows: "You state in your letter that you positively forbade me, in a personal conversation, to make the settlement as suggested to you while in Portland;" and he then goes on to detail the meeting and conversations had with plaintiff on the eve of his departure for Juneau, and he does not attribute to the plaintiff any statement authorizing the compromise. The version of that conversation, as set forth in this letter, wholly differs in that respect from Hannum's testimony on the witness stand. In this and other letters in evidence Hannum justifies the compromise on the ground that he wrote beforehand to Humphrey, telling him that, unless instructed to the contrary, he should make the compromise agreement. The plaintiff testifies that he received no such letters, and the letters in evidence written by Hannum before the agreement do not contain such a statement, but, on the contrary, merely request, as we have seen, authority from the plaintiff to enter into the agreement in question. Bostwick left Juneau on the 29th of July. Hannum left Portland the latter part of June, to go to Juneau, and must, therefore, have reached Juneau nearly a month before Bostwick's

departure from that place. Bostwick's testimony shows that he did not enter into the agreement of compromise, so called, because Hannum did not have the original notes, nor produce any authority empowering him to do what was proposed, and that he asked for such authority a few days before going away from Juneau. Notwithstanding this, on the 4th of August,—a few days after Bostwick left,—Hannum, as he now says, undertook to make such an agreement with Crews upon what he claims was the verbal authority given him by plaintiff in the preceding June, and about which he appears to have said nothing to Bostwick. It is clear from all this that the alleged authority given in the interview in question was not given, but that the claim made in that respect was an afterthought to excuse what had been done, if, as a matter of fact, there ever was such an agreement as that relied upon by the defendant.

The alleged agreement with Thorp, or with his attorneys, by which the $1,500 in question was applied in satisfaction of the Arvey lien, and credited as a payment on plaintiff's notes, is denominated "a compromise." Arvey had offered to take $1,200 in satisfaction of his lien, so Hannum testifies, and the effect of what was proposed was to make Humphrey pay this sum. It is not necessary to consider the question as to how far an attorney who is authorized to collect a debt may go in compromising his client's rights. Hannum not only undertook to represent Humphrey, who was to be made to pay the Arvey lien, but he represented the Arvey lien as well, and this Thorp, or those acting for him, knew. This lien was an incumbrance in the way of Thorp in the foreclosure of his mortgage, and he therefore had a pecuniary interest in its discharge. The arrangement of "compromise" by which this lien was satisfied out of money deposited in court for that purpose, and the amount charged as a payment by Thorp on his notes held by plaintiff, involved nothing in the nature of a consideration moving to Humphrey. The reiterated statement in the testimony of Hannum, Bostwick, and Thorp that this money was "paid" on plaintiff's notes has nothing whatever to support it in the facts relied upon as constituting such payment. What was attempted was, in effect, a reduction of plaintiff's demand on the notes, without any payment whatever. The entire transaction has the appearance of a fraudulent arrangement contrived to get rid of plaintiff's debt without paying it. If Hannum actually received this $1,500, he necessarily received it in his capacity as attorney for Arvey. Bostwick testifies that he, as Thorp's attorney, could not pay the $1,500, or any part of it, upon the Humphrey notes, or take it out of court, "unless the Arvey claim was dismissed." "The order of the court kept it there. It was not discretionary with me [Bostwick]. The court had put it there under decree. It could not be taken out until the claim was dismissed." If, then, Hannum got this money, it was in satisfaction of this Arvey claim which he represented, and which was required to be satisfied before the money "could be taken out." The story of the payment as told by Hannum is that at the time of the payment of the $1,500 described in the receipt an arrangement was made with Mr. Crews, of Bostwick & Crews, "look-

ing to the payment and discharge of the balance due upon these notes"; that such balance "was provided for by certificate of deposit, and the agreement was that the notes—the original notes—were to be forwarded to Juneau, either to myself [Hannum] or B. M. Behrens, or some other business man in Juneau that Mr. Humphrey might desire to send them to, and upon their receipt the money should be paid. Q. In whose hands? A. It was in the hands of Mr. Crews. Afterwards, after the agreement was fully consummated and agreed upon, and the terms fixed, the certificates of deposit were delivered to me, and put in the safe, where they have been ever since, I suppose," etc. Bostwick, who took out this certificate of deposit, testifies, according to his recollection, that the certificate was dated August 27, 1896 (it was in fact dated August 26, 1896), and was forwarded by him to Crews at Juneau. So that the provision for the payment of the balance due on the note by turning over the certificate of deposit to Crews was not, as testified to by Hannum, at the time of the so-called payment of the $1,500, but must, making allowance for the time required for the certificate to reach Juneau, have been at least a month later. And even then the alleged agreement had not been made, or its terms fixed, for Hannum testifies that "it [the certificate of deposit] was in the hands of Mr. Crews," and "afterwards, after the agreement was fully consummated and agreed upon and the terms fixed," the certificate of deposit was delivered to him (Hannum) and put in the safe, where "they" have ever since been, as he supposes. The certificate was made payable to the order of Crews, Thorp's attorney, and, according to Hannum, it was delivered to him (Hannum), and by him put in the safe, where it was when Hannum's deposition was taken on May 19, 1897. The firm of Bostwick & Crews was dissolved early in July, 1896, and was succeeded by Crews, Ivey & Hannum. The date of the association of Crews, Thorp's attorney, and Hannum, who represented Humphrey, does not appear, but it does appear, as we have seen, that when Crews delivered the certificate to Hannum it was placed in the safe, where it remained in May, 1897, and that this was the safe of the new firm. "I think they [the certificate of deposit, sometimes referred to as a certificate and at other times as the certificates] remain there. Q. In the bank up there? A. Yes, sir. Q. Or in Mr. Crews' possession? A. Yes, sir; in the safe." Bostwick testifies that this certificate of deposit was afterwards sent down from Juneau by Crews to him (Bostwick) in the early part of 1897, and that he cashed it. The indorsement upon the certificate shows that it was cashed February 9, 1897. Subsequently Bostwick corrected his testimony as to this, and stated that a mining man in Alaska, named Campbell, came to him with the certificate, for identification at the bank, and that in the course of that identification he signed his name on the back of the certificate, which was cashed by Campbell. From these facts, it is reasonably certain that this certificate of deposit was never transferred to Hannum, and that the claim now made of a payment or security by Crews to Hannum by that means to be applied in discharge of plaintiff's notes is without foundation. If the certificate was delivered

as testified to by Hannum, the fact that it was afterwards sent down to Bostwick by Crews, both attorneys for Thorp in respect to this very matter, and cashed, or was delivered by Crews to Campbell, and cashed by the latter, with Bostwick's indorsement, on February 9, 1897, while Hannum, testifying on the 17th of the following May, supposed it still in the firm safe at Juneau, justifies the inference that there never was any intention of applying any part of the money represented by the certificate on these notes, and that what was done was not a transfer of the certificate to Hannum, but merely the pretense of one. Thorp, in his testimony, testifies that plaintiff's notes have been paid in full, but he does not explain what became of the certificate of deposit in question, nor does it appear from his testimony that the money represented by it has not been received by him, or to his use. Upon his own theory of the case, the certificate was for a sum more than twice as large as what remained due on the notes, and it must be presumed that the certificate was cashed in his interest, and that he and those who acted for him can account for the certificate and its proceeds, if they were so disposed. The ratification by plaintiff relied upon consisted of an inquiry by Humphrey, the plaintiff, to Hannum, as to why, if he had made a collection on these notes, he did not pay over the amount received. This does not amount to a ratification of the so-called compromise. There was, as already appears, nothing to ratify. Hannum received nothing from Thorp on plaintiff's account. If he received the $1,500 deposited in court at Juneau, it was in satisfaction of the Arvey lien, which he represented, and on account of which the money was paid into court. As Bostwick explains: "The court had put it there under decree. It could not be taken out until the claim was dismissed." The discharge of the Arvey lien was indispensable to Thorp's foreclosure, and, having that lien discharged in this way, the claim now made that the plaintiff in good conscience should "restore" the $1,500, which he did not get, or be held to have "ratified" or "acquiesced in" Hannum's alleged agreement to receive the money paid by Thorp in discharge of the Arvey lien as a payment on plaintiff's notes, is without equity or reason.

As to the defense of another action pending in the state of Washington, the rule is thus stated in 1 Enc. Pl. & Prac. 764:

"The doctrine is well settled that an action in personam in a foreign jurisdiction cannot be pleaded in abatement of another action commenced in a domestic forum, even if there be identity of parties, of subject-matter, and of the relief sought. In the application of this rule the states of the Union are regarded as foreign to one another, as are also the courts of a state and a federal court held in another state or district."

The motion for a new trial is denied.